J-S02008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| EDWIN SOTO, JR. | |
| Appellant | No. 2857 EDA 2013 |

Appeal from the Judgment of Sentence September 6, 2013
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0002866-2012

BEFORE: MUNDY, J., OLSON, J., and WECHT, J.

MEMORANDUM BY MUNDY, J.:                    **FILED JUNE 10, 2015**

Appellant, Edwin Soto, Jr., appeals from the September 6, 2013 aggregate judgment of sentence of life imprisonment without the possibility of parole, imposed after being found guilty by a jury of one count of first-degree murder, two counts each of attempted murder and aggravated assault, and one count of carrying a firearm without a license.[1] After careful review, we affirm.

The trial court has set forth the relevant facts and procedural history of this case as follows.

> On the night and early morning leading up to the shooting on February 19, 2012, Magina Slowe discovered [Appellant] was at a local casino from a

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), 2702(a), and 6106(a), respectively.

post she saw on Facebook. Magina Slowe, was the mother of [Appellant]'s child and had an unsteady relationship with [Appellant] spanning several years. Ms. Slowe, after learning of the Facebook post, sent a text message to [Appellant] to ask him why he was at the casino rather than watching her daughter. [Appellant] then called her, and suggested she found out about his time at the casino from a "boy" at the casino. [Appellant] was angry and said to Ms. Slowe over the phone, he "had something for her and the boy," which she understood to be a threat.

Sometime around 2:30 A.M. on February 19, 2012, [Appellant] and his brother, Darryl Moore, left the casino and drove to a popular late-night restaurant called J&S Seafood. The two men entered the restaurant and saw the familiar face of Magina Slowe.

Mr. Moore approached Ms. Slowe, gave her a hug, and started talking to her. Mr. Moore is the uncle of Ms. Slowe's (and [Appellant]'s) daughter. While Mr. Moore and Ms. Slowe spoke, [Appellant] attempted to interrupt the conversation, but both Mr. Moore and Ms. Slowe remained unresponsive to [Appellant]'s attempts. [Appellant] was upset about Mr. Moore speaking to Ms. Slowe, because [Appellant] believed Ms. Slowe was responsible for [Appellant]'s sister being incarcerated. [Appellant], while being ignored, lifted up his shirt, exposing his gun to Mr. Moore and Ms. Slowe. While Mr. Moore and Ms. Slowe were talking, Jamecia Toler, the cousin and close friend of Ms. Slowe, entered the restaurant to join Ms. Slowe and one other friend. Mr. Moore playfully threw a piece of paper at Ms. Toler and began talking to her.

[Appellant] and Mr. Moore went to leave the restaurant once they received food. As soon as they got into Mr. Moore's car, parked just outside the storefront, they started arguing about whether or not Mr. Moore should be speaking to Ms. Slowe.

[Appellant] then stormed out of the car and shot through the windshield, hitting Mr. Moore in the upper right chest as Mr. Moore was trying to exit the car. Then [Appellant] shot Mr. Moore again, which resulted in Mr. Moore falling to the ground. [Appellant] walked over to Mr. Moore, stood over him, and pointed a gun at Mr. Moore's head. Mr. Moore pleaded for his life.

Meanwhile, as the people inside J&S heard the gun shots, Ms. Toler ran out the front of the store where the shooting was taking place. Ms. Toler was shot by [Appellant], and died at the scene. The medical examiner was unable to conclusively determine how many times she was shot, because one or more bullets could have made several entries and exits through her body. However, the medical examiner found five gunshot wounds on Ms. Toler. The fatal shot went through her heart and left lung.

After firing shots outside the storefront, [Appellant] again entered J&S Seafood. [Appellant] allowed two unknown males in the restaurant to leave and then he immediately began shooting at Ms. Slowe inside the store. She was shot in the chest, and then stumbled to the back of the store where he continued to shoot at her. [Appellant] exited the store briefly, for an unknown reason, and then returned back to Ms. Slowe. [Appellant] continued shooting at Ms. Stowe. She was shot a total of thirteen times. [Appellant] aimed the gun at her head as she pleaded for him to think of his daughter. He left the rear entrance of the building, and shot himself in his chin through the top of his head.

At trial, there was ample evidence regarding [Appellant]'s intoxication and mens rea. Mr. Moore saw [Appellant] having one beer at the casino, before they arrived at J&S Seafood together. Both, Mr. Moore and Ms. Slowe, testified to having prior personal knowledge of how [Appellant]'s behavior changes while intoxicated. Additionally, each of them testified to [Appellant]'s *absence* of intoxication

behaviors at the time leading up to the shooting and during the shooting. Mr. Moore testified to [Appellant] walking straight without stumbling, and being able to clearly understand [Appellant]'s speech. Ms. Slowe also testified to [Appellant] walking normally and being able to understand everything [Appellant] said that night without trouble. She also claimed to be able to know when [Appellant] is drunk, because normally his face will get red, and his eyes become low. Ms. Slowe said none of these facial changes were apparent at the scene of the shooting.

[Appellant]'s toxicology report dated February 19, 2012 from Crozer-Chester Medical Center, found a blood alcohol level of 160 milligrams per deciliter. The blood sample for this report was taken at 3:54 A.M., and the incident occurred at approximately 3:08 A.M.

Dr. Richard Saferstein, Ph.D., testified at trial on behalf of [Appellant] as an expert witness in forensic toxicology. Dr. Saferstein converted the 160 milligrams per deciliter to a whole blood reading of .137 percent. Moreover, he determined [Appellant]'s blood alcohol level was .148 at the time of the shooting. According to Dr. Saferstein, it would be impossible to achieve this blood alcohol level by drinking one beer. Dr. Saferstein further opined that [Appellant] would have to consume approximately ten ounces of 80 proof alcohol in order to reach the estimated blood alcohol level at the time of the shooting. Dr. Saferstein also affirmed [Appellant] was in a significantly impaired state with a reasonable degree of scientific certainty.

On cross-examination, the Commonwealth focused on the symptoms Dr. Saferstein claimed [Appellant] would likely be showing at his reported alcohol level. For example, poor balance and poor body coordination. The Commonwealth also established before the jury that Dr. Saferstein did not take into account any information about how [Appellant] personally responds to alcohol or the

accuracy of [Appellant]'s shooting. Dr. Saferstein also opined on cross [examination] that [Appellant] was aware of what he was doing when he committed the offenses. The Commonwealth's expert witness for forensic toxicology was stricken because the witness failed to express his opinion with a reasonable degree of professional certainty.

The jury in [Appellant]'s trial was properly charged with the following instructions, regarding the intoxication defense:

> The defendant is permitted to claim as a defense that he was so overpowered by intoxicants that the defendant had lost control of his faculties and was incapable of forming the specific intent to kill required by First Degree Murder. […] The Commonwealth has the burden of disproving this defense. Thus, you cannot find the defendant guilty of First Degree Murder unless you are satisfied beyond a reasonable doubt that the defendant, despite any intoxicated condition, was at the time capable of forming a specific intent to kill and did in fact form that intent.

Trial Court Opinion, 10/23/14, at 1-5 (internal citations omitted).

On June 25, 2013, at the conclusion of Appellant's trial, the jury found him guilty of the aforementioned offenses. On September 6, 2013, Appellant was sentenced to an aggregate judgment of sentence of life imprisonment without the possibility of parole.[2] On September 10, 2013,

_____

[2] Specifically, Appellant was sentenced to life imprisonment without the possibility of parole on the count of first-degree murder. Each count of aggravated assault merged with the respective attempted murder count, and on each of those counts Appellant received sentences of 20 to 40 years' imprisonment, to run consecutively to each other and to the first-degree
*(Footnote Continued Next Page)*

Appellant filed a timely post-sentence motion, which the trial court denied on September 12, 2013. On October 10, 2013, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant raises the following issue for our review.

> Whether the evidence was sufficient to sustain the conviction of first[-]degree murder where the Commonwealth failed to disprove [Appellant]'s evidence that his level of intoxication precluded him from forming the specific intent to kill as required for this offense?

Appellant's Brief at 5.

We begin by noting our well-settled standard of review. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." **Commonwealth v. Patterson**, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, **Patterson v. Pennsylvania**, 135 S. Ct. 1400 (2015). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so

_(Footnote Continued)_ ───────────

murder charge. Finally, Appellant was sentenced to two and one-half to five years' imprisonment for the firearms charge, to run concurrent to the first-degree murder charge.

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." ***Commonwealth v. Watley***, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, 95 A.3d 277 (Pa. 2014). As an appellate court, we must review "the entire record … and all evidence actually received[.]" ***Id.*** (internal quotation marks and citation omitted). "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Orie***, 88 A.3d 983, 1014 (Pa. Super. 2014) (citation omitted), *appeal denied*, 99 A.3d 925 (Pa. 2014). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013) (citation omitted), *cert. denied, **Diamond v. Pennsylvania***, 135 S. Ct. 145 (2014).

Instantly, Appellant was convicted of murder of the first degree, which is codified as follows.

> **§ 2502. Murder**
>
> **(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
>
> …
>
> **(d) Definitions.--**As used in this section the following words and phrases shall have the meanings given to them in this subsection:

…

> **"Intentional killing."** Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S.A. § 2502.

Furthermore, our Supreme Court has consistently stated when proving the sufficiency of the evidence for first-degree murder, the Commonwealth's burden is as follows.

> In order to sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. Specific intent and malice may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body.

*Commonwealth v. Arrington*, 86 A.3d 831, 840 (Pa. 2014) (internal citation omitted), *cert. denied*, *Arrington v. Pennsylvania*, 135 S. Ct. 479 (2014).

Instantly, the focus of Appellant's argument is based on whether he had the "specific intent to kill." Appellant's Brief at 11. Appellant correctly asserts that the defense of voluntary intoxication "can be used to negate the 'specific intent to kill' element of first degree murder." *Id.* Appellant concedes the standard is very high and that he must show he was "overwhelmed to the point of losing his faculties and sensibilities." *Id.*, *quoting Commonwealth v. Blakeney*, 946 A.2d 645, 653 (Pa. 2008), *cert.*

*denied*, **Blakeney v. Pennsylvania**, 555 U.S. 1177 (2009). However, Appellant cites Dr. Richard Saferstein's testimony regarding Appellant's blood alcohol content (BAC) and his expert opinion of the mental state of a person with that BAC. *Id.* at 12. Appellant asserts that the "evidence presented by Dr. Saferstein went unanswered, [therefore] the Commonwealth simply failed to prove beyond a reasonable doubt that [Appellant] had the requisite specific intent to kill when he fired the gun." *Id.* at 13.

We begin by noting Appellant acknowledges taking the following steps to shoot the three victims, and he concedes he killed Toler.

> The two men left the casino at approximately 2:30 AM and drove to a food store known as "J&S Seafood" to eat. Once there, they encountered a woman [Appellant] had dated in the past, Magina Slowe, and some of her friends. They all talked for a bit, after which [Appellant] and his brother returned to their car with the food.
>
> At this point, however, he became agitated and began arguing with Moore. **He "stormed" out of the car and began firing gunshots that hit his brother. Then, he went back into the food store and shot Ms. Slowe and another woman, Jamecia Toler. Ms. Toler died from her wounds.**

Appellant's Brief at 6 (emphasis added; internal citations omitted).

Further, as the trial court noted in its opinion, "[s]pecific intent to kill could have been reasonably inferred by either [Appellant] shooting [Toler] through her head, or even from [Appellant]'s selectiveness when targeting his victims." Trial Court Opinion, 10/23/14, at 6. Pennsylvania courts have

- 9 -

consistently held that such evidence is sufficient to establish the specific intent to kill for a first-degree murder conviction. *See Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013) (concluding sufficient evidence of specific intent to kill existed where, "eye witness testimony demonstrate[d] that after [the defendant] … fatally shot the victim in the head at close range while the victim was lying defenseless on the ground[]"), *cert. denied*, *Mattison v. Pennsylvania*, 135 S. Ct. 221 (2014); *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa. Super. 2012) (concluding the defendant "surely intended the shooting to have fatal results as he fired three shots at the victim's head, a vital part of the body[]"), *appeal denied*, 63 A.3d 773 (Pa. 2013).

Nevertheless, voluntary intoxication may negate the defendant's specific intent to kill, and as such, evidence of voluntary intoxication "may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder." 18 Pa.C.S.A. § 308.

> Intoxication, however, may only reduce murder to a lower degree if the evidence shows that the defendant was overwhelmed to the point of losing his faculties and sensibilities. The value of such evidence is generally for the finder of fact, who is free to believe or disbelieve any, all, or none of the testimony addressing intoxication.

*Blakeney*, *supra*; *see also Commonwealth v. Vandivner*, 962 A.2d 1170, 1177 (Pa. 2009) (citations and quotation marks omitted) (holding "[w]hether a defendant has established that his faculties and sensibilities

were so overwhelmed with drugs so that he could not form the specific intent to kill is a question of fact solely within the province of the jury, who is free to believe any, all, or none of the testimony regarding intoxication[]”), *cert. denied*, **Van Divner v. Pennsylvania**, 559 U.S. 1038 (2010).

Additionally, we note the Commonwealth's burden in light of such a defense is as follows.

> In any criminal prosecution, the Commonwealth has an unshifting burden to prove beyond a reasonable doubt all elements of the crime. One of such elements in first degree murder is, of course, a specific intent to kill. This burden is neither increased nor diminished by an attempt by a defendant to disprove the element of intent by a showing of lack of capacity, due to intoxication, to form such an intent. Whether the Commonwealth will, in a particular case, elect to carry that burden without introducing evidence to negate the existence of a disabling condition of intoxication, or whether it will seek to introduce such evidence, will be for it to decide; as in every case, the risk of non-persuasion remains with the Commonwealth. Whatever the district attorney's decision may be in that regard, it is error for the trial judge to instruct the jury that there is a burden upon the defendant to establish his intoxication by a preponderance of the evidence. Such evidence is offered by the defense solely to cast doubt upon the existence of the specific intent to kill and, as with all elements of the crime, the defendant has no burden of persuasion.
>
> We emphasize that our insistence upon the Commonwealth's burden to prove beyond a reasonable doubt all elements of the crime does not require it to disprove a negative. Thus, to enable a defendant to seek to negate specific intent by reliance on the fact of his intoxication, there must be

- 11 -

evidence in the case sufficient to place in issue that fact concerning defendant's mental condition. Such evidence may be adduced by the defendant as part of his case, or, conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination. Once a defendant has come forward with such evidence, or it is in the case otherwise, the Commonwealth, as we have indicated above, may introduce testimony to refute it, but is under no duty to do so.

*Commonwealth v. Rose*, 321 A.2d 880, 884-885 (Pa. 1974).

Instantly, the trial court accurately recounted the testimony presented to the jury at trial.

In the present case, there was a strong amount of conflicting testimony regarding [Appellant]'s defense of intoxication. In favor of [Appellant], the toxicology report and the expert witness in toxicology suggested [Appellant] had a lot more than just one beer. Dr. Saferstein converted the results from the toxicology report, which was 160 milligrams per deciliter, to a whole blood reading of .137 percent. The blood sample was taken within an hour after the incident. Dr. Saferstein also opined on direct examination that [Appellant] was in a significantly impaired state. Additionally, the Commonwealth's toxicology expert was stricken from the record.

Alternatively, in favor of the Commonwealth, Mr. Moore and Ms. Slowe both testified about failing to observe any signs of drunkenness. Mr. Moore testified at trial that he saw [Appellant] drinking only one beer at the casino. Ms. Slowe testified about how [Appellant]'s face normally becomes red and his eyes hang low when he drinks. Then she testified to the absence of these facial signs on the night of the incident. Moreover[,] on cross examination of [Appellant]'s expert witness in toxicology, Dr. Saferstein, opined that [Appellant] was aware of what he was doing when he committed the offenses.

- 12 -

Dr. Saferstein also explained on cross, that [Appellant] would likely be showing signs of poor balance and poor body coordination. However, the Commonwealth's witnesses denied any of those signs being apparent.

There was ample evidence and testimony for the jury to reach the decision they made. Conflicting evidence is not a reason to grant a new trial. Trials naturally bring about an adversarial setting. The jury is free to believe any, all, or none of the evidence. In this case, the jury chose to find [Appellant]'s intoxication did not overpower his ability to form the specific intent to kill.

Trial Court Opinion, 10/23/14, at 8-9. Upon review of the certified record we conclude that the trial court's findings are completely supported by the record. Further, as noted, the jury was free to believe any or all of the evidence presented as to whether Appellant could form the specific intent to kill. **Vandivner**, **supra**. Here, the jury clearly believed the Commonwealth's witnesses' accounts and found that Appellant's intoxication did not negate his specific intent to kill. As a result, the evidence was sufficient to disprove his intoxication defense beyond a reasonable doubt, and the Commonwealth met its burden regarding Appellant's specific intent to kill. **See, e.g**, **Blakeney**, **supra**.

Based on the foregoing, we conclude the Commonwealth presented sufficient evidence to enable the jury to find Appellant had the specific intent to kill. Accordingly, the trial court's September 6, 2013 judgment of sentence is affirmed.

Judgment of sentence affirmed.

- 13 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/10/2015